| | |
|---|---|
| STABILITY SOLUTIONS, LLC, a Wyoming limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>MEDACTA USA, INC., a Delaware corporation, and DOES 1-25,<br><br>Defendant. | Civil Action No. 3:23-cv-00072<br>District Judge Waverly D. Crenshaw, Jr.<br>Magistrate Judge Alistair Newbern<br><br>**JURY DEMAND** |

# FIRST AMENDED COMPLAINT

1) VIOLATION OF SALES REPRESENTATIVE ACT (CAL. CIVIL CODE SECTIONS, 1738.10, ET SEQ.); 2) BREACH OF CONTRACT; 3) BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING; 4) UNJUST ENRICHMENT; 5) QUANTUM MERUIT; 6) ACCOUNTING; 7) UNFAIR BUSINESS PRACTICES (CAL. BUS. & PROF. SECTIONS 17200, ET SEQ.); 8) DECEPTIVE TRADE PRACTICES (DEL. CODE § 2532, ET SEQ.); 9) FRAUD; 10) PROMISSORY ESTOPPEL; 11) DECLARATORY RELIEF

Plaintiff STABILITY SOLUTIONS, LLC ("Stability Solutions" or "Plaintiff"), by and through its undersigned attorneys, hereby complains against Defendant MEDACTA USA, INC. ("Medacta" or "Defendant") and DOES 1-25 inclusive, and each of them, demands a trial by jury of all issues and for causes of illegal action allege as follows:

## INTRODUCTION

1. Plaintiff is informed and believes and thereon alleges that it was, and is, Medacta's practice and policy to set quotas for its distributors, including Plaintiff, that are impossible or nearly impossible to achieve. Medacta engages in this scheme so that it can pretend to commit itself to contracts with distributors with terms of two years or longer while, *sub silencio,* reserving the right to terminate at will. By setting impossible quotas, Medacta endeavored to create a perpetual basis for "cause" for early termination, including whenever it decides to compete with a distributor and sell directly in a distributor's exclusive territory.

2. Medacta managers induce its distributors to devote their time, money and efforts to developing their territories by assuring them that Medacta will not enforce the quotas. Plaintiff is informed and believes and thereon alleges that none or almost none of Medacta's distributors met their quotas during the relevant time period, and that none or almost none of Medacta's distributors had their contracts terminated.

3. As described further below, Medacta set unachievable quotas for Plaintiff while providing assurances that they would not be enforced. Plaintiff devoted his time, money and efforts to developing its territory. However, when Medacta decided it would make more money by taking Plaintiff's territory and sales representatives, Medacta terminated the contract on the grounds that Plaintiff had not met its quota.

## THE PARTIES AND JURISDICTION

4. Plaintiff Stability Solutions, LLC is a limited liability company organized under the laws of the State of Wyoming and doing business in California. Ash Shaalan ("Shaalan") is and was, at all relevant times, the sole owner of Stability Solutions.

5. Plaintiff was, at all relevant times, working as an independent sales agent distributing and selling Defendant Medacta USA, Inc.'s implantable orthopedic medical

devices in the following California counties: Alameda, Contra Costa, El Dorado, Marin, Monterey, Placer, Sacramento, San Francisco, San Joaquin, San Mateo, Santa Clara, Santa Cruz, Solano, Sutter, and Yolo.

6. Plaintiff was, at all relevant times, actively engaged in the sales of Medacta's medical devices in San Francisco County.

7. Medacta is a corporation organized under the laws of the State of Delaware and doing business in California.

8. Plaintiff is ignorant of the true names and capacities, whether individual, corporate or otherwise, of the defendants sued as Does 1-25 and therefore sues these defendants by such fictitious names. Plaintiff is informed and believes and thereon alleges that each of these fictitiously named defendants is responsible in some manner for the occurrences herein alleged, and that Plaintiff's injuries as herein alleged were proximately caused by the conduct of the aforementioned defendants.

9. Plaintiff is informed and believes and thereon alleges that at all relevant times each of the defendants was the agent and/or principal of the other and acted within the course and scope of such agency or employment. Plaintiff is informed and believes and thereon alleges that each and every wrongful act by defendants was done with the approval, express or implied, of each of the other defendants, and each defendant has ratified and approved the acts and omissions of each of the others.

## GENERAL ALLEGATIONS

10. Defendant Medacta is in the business of manufacturing implantable medical devices and instruments for joint replacements.

11. Plaintiff Stability Solutions is in the business of selling implantable medical devices and instrumentation to orthopedic surgeons. Plaintiff relies on its long-standing reputation in the medical device sales industry and the expansive network of contacts cultivated by Plaintiff and Shaalan over the course of several decades. Plaintiff hired outside sales representatives as independent contractors to facilitate marketing and sales of these devices.

12. In or about January of 2021, Medacta began recruiting Plaintiff to enter into an independent sales agent agreement. Medacta sought to capitalize on Plaintiff's existing professional network and long-standing reputation in the Bay Area. At the time, Medacta had little to no customers in the Bay Area.

13. In or about April 2021, Plaintiff and Medacta entered into an agreement, partially in writing as reflected in the "Independent Sales Agent Agreement," partially oral, and partially implied by conduct ("the Agreement"). The parties agreed to a minimum term of two years.

14. Pursuant to the Agreement, Medacta appointed Plaintiff as its authorized agent and independent outside sales representative, tasked with selling and marketing Medacta medical devices and instrumentation, as well as related training, to hospitals, medical centers, and physicians in California. Medacta authorized Plaintiff to act as its agent in the following California counties: Alameda, Contra Costa, El Dorado, Marin, Monterey, Placer, Sacramento, San Francisco, San Joaquin, San Mateo, Santa Clara, Santa Cruz, Solano, Sutter, and Yolo.

15. Section 1.2. of the Agreement provides for a Minimum Sales Volume of $2 million in the first year. According to a written provision of the Agreement, if Plaintiff does not achieve this number "for each calendar year of the Term (or portion thereof) (each, a Sales Period)" and Medacta decides to eliminate Plaintiff's Agreement or its territories, then Medacta must follow a specific and detailed process. Section 1.2.2 provides:

> Upon failure of Agent to meet the requirements specified in Section 9.2.5, Medacta may elect to modify or eliminate portions of the Territory at any time during the Term upon notice and an opportunity to cure consistent with Section 9.2.5. Agent must submit a written improvement plan, deemed acceptable to Medacta, detailing specific actions to cure defaults as provided in Section 9.2.5. If Agent's efforts to cure are not successful within the agreed upon time frame, Medacta may modify, change or eliminate portions of the Territory upon thirty (30) days written notice.

16. Section 9.2.5 provides that: "Medacta may, upon notice to Agent, terminate this Agreement prior to the expiration of the Term" upon "Failure of Agent to meet (i) the applicable Minimum Sales Volume for any Sales Period or (ii) at least Seventy-Five percent

(75%) of the applicable Minimum Sales Volume for any 2 consecutive Quarters of any Sales Period **subject to the following opportunity to 'cure' process."** (Emphasis added).

17. The contractual "cure process" requires four steps. First, Medacta must "provide written notice advising Agent of the Minimum Sales Volume default." Second, after receiving the written notice of default, Plaintiff "must prepare a written improvement plan, detailing specific actions to cure said defaults." Third, Medacta must review the written improvement plan, then accept, modify or reject the improvement plan and/or the period of time set to cure the default. Fourth, Medacta must give Plaintiff the opportunity to cure the default within the "notice period contained in an improvement plan approved by Medacta."

18. Section 9.2.5 adds: "For the avoidance of doubt, the failure to present, in Medacta's sole judgment, an acceptable written improvement plan and/or failure to cure Minimum Sales Volume defaults after a notice period contained in an improvement plan approved by Medacta, shall constitute defaults considered no longer curable by Agent, and Medacta may terminate effective immediately[.]"

19. Section 6.9. of the Agreement provides: "In the event this Agreement expires or terminates, Agent shall earn commissions on all orders already placed with Medacta prior to the effective date of such termination, and for which Medacta accepts and actually receives full payment due from the Customer."

20. Before, during and after Plaintiff signed the Agreement, Medacta's Area Director, Jim Shannon ("Shannon"), and Vice President of Sales, Steve Kirschner ("Kirschner"), assured Shaalan that the Minimum Sales Volume number was only a "soft goal" and that Plaintiff would not be expected or required to achieve these numbers to avoid contract termination. Shannon and Kirschner emphasized that the Minimum Sales Volume number was not realistic for the first one-year sales cycle in this industry; told Shaalan, "just do the best you can;" and told Shaalan that "any growth you are able to bring to the table is sufficient," considering Medacta had failed to penetrate the Bay Area market for years. Shannon and Kirschner further acknowledged that Plaintiff would need significant support from Medacta to successfully recruit hospitals and surgeons to use Medacta products.

21.     Medacta representatives made the above representations and promises to induce Plaintiff to enter into the Agreement and to continue devoting time, money and resources to building Medacta's customer base in the Bay Area and to forego opportunities to sell medical devices for other companies.  Pursuant to the Agreement, Plaintiff hired two independent contractor sales representatives, Jim Karl ("Karl") and Larry Walsh ("Walsh"), to help with marketing and sales in the Bay Area and Central Valley, respectively.

22.     From approximately April 2021 through December 2021, Medacta treated the Minimum Sales Volume as a soft goal and provide support to Plaintiff's efforts.  For example, Medacta representatives coordinated mobile labs for surgeons, attended joint sales calls with Shaalan and his sales representatives, attended surgeon/customer meetings with Shaalan and his sales representatives, provided promotional materials and product training, and provided other marketing and sales support.

23.     During this time, Plaintiff steadily increased the amount of Medacta sales and the number of surgeons using Medacta products in the Bay Area, including Dr. Nicholas Mast ("Dr. Mast") and Dr. Derek Amanatullah ("Dr. Amanatullah"), who subsequently generated significant revenue for Medacta.  By December 2021, Plaintiff had established a substantial network of customers and potential customers for Medacta products, including within the Bay Area.

24.     In or about December 2021, Medacta hired David Waters ("Waters") as its new Area Director, replacing Shannon.  Around this same time, Medacta began systematically cutting off all the support that had been previously promised and provided to Plaintiff.  Waters ignored their standing weekly telephone meetings as well as Shaalan's phone calls and emails.  So did other Medacta representatives.

25.     In or about March 2022, Shaalan learned that Waters had begun secretly meeting directly with surgeons whom Plaintiff had recruited without informing Shaalan or inviting Shaalan and/or his sales representatives.  Shaalan further learned that Waters had been secretly meeting with Plaintiff's outside sales representatives, Karl and Walsh, and that Waters was advising Karl and Walsh that "Shaalan's days at Medacta are numbered."

26. On or about April 1, 2022, Medacta unilaterally and in bad faith issued Plaintiff new and significantly increased quotas, by more than 50%, for Plaintiff's Minimum Sales Volumes for the second year of the Agreement, covering April 1, 2022 to March 31, 2023. Between January and July 2022, Plaintiff's annual sales volume had grown significantly from the previous year.

27. For most of the contract term, Medacta representatives consistently expressed positive feedback to Shaalan. Shannon and Kirschner frequently repeated the sentiment that "any growth you are able to bring to the table is sufficient" because Medacta had previously been trying but failing to establish a Bay Area customer base. Other Medacta executives and representatives congratulated Plaintiff on his ability to build a customer base in a previously failing geographic area. At no point during this period did anyone from Medacta ever issue any warnings to Plaintiff that his Agreement with Medacta was at risk of early termination due to not meeting the Minimum Sales Volume.

28. On or about July 19, 2022, Medacta provided Plaintiff with a written termination notice, stating that Plaintiff's Agreement with Medacta was being terminated immediately pursuant to Section 9.2.5 of the Agreement. The termination letter stated that Plaintiff had not achieved "the Minimum Sales Volume for the first year of the Initial Term (i.e., the period commencing April 1, 2021 and ending March 31, 2022)."

29. Medacta did not "provide written notice advising Agent of the Minimum Sales Volume default;" did not allow Plaintiff to submit "a written improvement plan, detailing specific actions to cure said defaults;" did not review the written improvement plan, or accept, modify or reject the improvement plan and/or the period of time set to cure the default; did not give Plaintiff the opportunity to cure the default within the "notice period contained in an improvement plan approved by Medacta;" and therefore, did not provide "thirty (30) days written notice" before eliminating all territories.

30. Plaintiff is informed and believes that Medacta has hired Plaintiff's outside sales representatives, Karl and Walsh, as W-2 employees of Medacta; that Medacta required Karl and Walsh to sign non-compete agreements, and that Medacta thereby prohibited Karl

and Walsh from working with Plaintiff. Shaalan is informed and believes and thereon alleges that Medacta is paying Karl and Walsh significantly less than it was required to pay Plaintiff under the Agreement on the same territories.

31. Plaintiff is informed and believes that Medacta has offered and entered into design consultant deals with surgeons recruited to Medacta by Plaintiff, including but not limited to, Drs. Mast and Amanatullah. Under those deals, surgeons receive royalties from Medacta in exchange for helping Medacta design new medical devices, thereby financially incentivizing the surgeons to work exclusively with Medacta. Plaintiff is informed and believes that Medacta intends to release a new medical implant, designed with Dr. Mast, which will result in a large increase in sales in Plaintiff's territories, directly attributable to Plaintiff and Plaintiff's recruitment of Dr. Mast. Plaintiff is informed and believes that Waters has been directing Plaintiff's customers not to communicate with Plaintiff, though Plaintiff had dedicated years to developing these relationships.

32. In August 2022, it appears Medacta paid Plaintiff some commissions for the month of July. Medacta did not send Plaintiff an accounting of the orders, information on customer's names and invoice numbers, nor the rate of commission on any orders after July 21, 2022. Plaintiff is informed and believes and thereon alleges Medacta is withholding additional earned commissions.

**FIRST CAUSE OF ACTION**
**VIOLATION OF INDEPENDENT WHOLESALE SALES REPRESENTATIVE ACT**
**Cal. Civil Code § 1738.10, *et seq*.**
**(Plaintiff against Defendant MEDACTA USA, INC. and Does 1-25)**

33. Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

34. Plaintiff was a "wholesale sales representative." Medacta was a "manufacturer," "jobber," or "distributor," as defined in Civil Code § 1738.12.

35. Civil Code § 1738.13(b) requires a "manufacturer," "jobber," or "distributor" to include the following in a written contract with a "wholesale sales representative": "(1) The rate and method by which the commission is computed, (2) The time when commissions will

be paid, (3) The territory assigned to the sales representative, (4) All exceptions to the assigned territory and customers therein, (5) What chargebacks will be made against the commissions, if any."

36. Cal. Civil Code § 1738.13(d) requires a "manufacturer," "jobber," or "distributor" to provide the following written information and documentation to the "wholesale sales representative" with payment of each commission: "(1) An accounting of the orders for which payment is made, including the customer's name and invoice number, (2) The rate of commission on each order, (3) Information relating to any chargebacks included in the accounting."

37. A manufacturer, jobber, or distributor who willfully fails to enter into a written contract as required by this chapter or willfully fails to pay commissions as provided in the written contract shall be liable to the sales representative in a civil action for treble damages.

38. Defendants violated the Independent Wholesale Sales Representatives Act by, among other things, failing to include material commission terms in writing, failing to provide a proper accounting with each payment, failing to pay commissions under the Agreement and preventing Plaintiff from earning commissions under the Agreement; terminating the Agreement without cause; and terminating the Agreement without providing notice and opportunity to cure.

39. As a direct and foreseeable result of Defendants' violations, Plaintiff has suffered and will continue to suffer damages in the form of lost revenue, commissions and other compensation.

40. Defendants are liable for treble damages and Civil Code § 1738.15 for willfully failing to pay commissions that were earned or would have been earned under the Agreement, willfully failing to enter into a proper written contract with Plaintiff and willfully failing to provide a proper accounting with each payment.

41. Plaintiff is entitled to interest, attorneys' fees and costs under Civil Code § 1738.16.

WHEREFORE, Plaintiff prays judgment against Defendant as set forth below.

## SECOND CAUSE OF ACTION
## BREACH OF CONTRACT
### (Plaintiff against Defendant MEDACTA USA, INC. and Does 1-25)

42. Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

43. In or about April 2021, as described above, Plaintiff and Medacta entered into an agreement, partially in writing as reflected in the "Independent Sales Agent Agreement," partially oral and partially implied by conduct ("the Agreement").

44. Plaintiff has performed all obligations on its part under the Agreement except as to those provisions, including without limitation, provisions related to Minimum Sales Volume, that were impossible or impracticable to perform, that were waived through Defendants' words, conduct and omissions; that were unconscionable and/or unenforceable; that Defendants are estopped to enforce; that were obtained by fraud; that were product of mutual mistake, that were modified; that Plaintiff was prevented from performing by virtue of Defendants' conduct, and that Plaintiff was excused from performing.

45. Defendants breached the Agreement by, among other things:

- failing to establish in good faith the applicable Minimum Sales Volume for the first year of the Agreement, or any quarter therein, as required by section 1.2;

- failing to establish in good faith the applicable Minimum Sales Volume for the second year of the Agreement or any quarter therein, as required by section 1.2;

- withdrawing and failing to provide sales and marketing support;

- purporting to enforce provisions relating to the Minimum Sales Volume which were unenforceable due to waiver, estoppel, unconscionability, impossibility, impracticability, prevention of performance, fraud, mistake, modification and excuse, among other things;

- failing to provide advance notice of Plaintiff's purported default, as required by Sections 1.2.2 and 9.2.5. of the Agreement;

- failing to allow Plaintiff to prepare a written improvement plan, as required by Sections 1.2.2 and 9.2.5. of the Agreement;

- failing to allow Plaintiff the opportunity to cure the default within the "notice period contained in an improvement plan approved by Medacta;"

- failing to give an additional "thirty (30) days written notice" upon any failure by Plaintiff to cure within the notice period";

- terminating the Agreement without cause; and

- failing to pay Plaintiff all commissions owed under the Agreement.

46. As a direct and foreseeable result of Medacta's breach, Plaintiff has suffered and will continue to suffer damages in the form of damage to his long-standing reputation in the market, lost revenue, income, commissions, profit and other compensation, as well as interest, attorneys' fees, and costs.

47. Plaintiff is entitled to recover its reasonable attorneys' fees and costs pursuant to section 13.9. of the Agreement.

WHEREFORE, Plaintiff prays judgment against Defendant as set forth below.

### THIRD CAUSE OF ACTION
### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (Plaintiff against Defendant MEDACTA USA, INC. and Does 1-25)

48. Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

49. Implied in every contract is the covenant that each party will act in good faith and deal fairly with each other party to the contract and will do nothing to deprive any party of the contractual benefits due under the contract.

50. Medacta breached its duty of good faith and fair dealing to Plaintiff by, among other things:

- falsely promising not to enforce the Minimum Sales Volume numbers without intending to honor that promise;

- falsely promising to provide sales and marketing support without intending to honor that promise;

- withdrawing and failing to provide sales and marketing support;

- falsely promising to retain Plaintiff as a distributor for at least two years without intending to honor that promise;

- inducing Plaintiff to spend time, money and resources hiring sales representatives and developing customers while intending to terminate the Agreement and contract directly with Plaintiff's customers and sales representatives;

- failing to establish in good faith the applicable Minimum Sales Volume for the first year or second year of the Agreement, or any quarter therein;

- purporting to enforce provisions relating to the Minimum Sales Volume which were unenforceable due to waiver, estoppel, unconscionability, impossibility, impracticability, prevention of performance, fraud, mistake, modification and excuse, among other things;

- interfering with, undermining and sabotaging Plaintiff's relationships with its outside sales representatives and customers;

- failing to provide in good faith notice and opportunity to cure to Plaintiff;

- terminating the Agreement based on Minimum Sales Volume numbers after assuring Plaintiff that it would not enforce those numbers against Plaintiff; and

- terminating the Agreement to contract directly with the surgeon/customers and sales representatives recruited by Plaintiff and thereby, avoid having to pay Plaintiff for his efforts.

51. As a direct and foreseeable result of Medacta's breach, Plaintiff has suffered and will continue to suffer damages in the form of damage to his long-standing reputation in the market, lost revenue, income, commissions, profit and other compensation, as well as interest, attorneys' fees, and costs.

52. Plaintiff is entitled to recover its reasonable attorneys' fees and costs pursuant to section 13.9. of the Agreement.

WHEREFORE, Plaintiff prays judgment against Defendant as set forth below.

//
//
//

## FOURTH CAUSE OF ACTION
## UNJUST ENRICHMENT
**(Plaintiff against Defendant MEDACTA USA, INC. and Does 1-25)**

53. Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

54. Medacta received the benefit of Plaintiff's services, to wit, Plaintiff secured sales orders for Medacta products, the buyers of those products paid the purchase price directly to Medacta, Medacta retained the funds from those purchases, and Plaintiff did not receive any compensation for certain services provided and certain sales of Medacta products, thereby making it unjust for Medacta to retain these benefits.

55. As a result of Medacta's conduct, Medacta has been and continues to be unjustly enriched at Plaintiff's expense, in an amount to be proven at trial.

WHEREFORE, Plaintiff prays judgment against Defendant as set forth below.

## FIFTH CAUSE OF ACTION
## QUANTUM MERUIT
**(Plaintiff against Defendant MEDACTA USA, INC. and Does 1-25)**

56. Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

57. Medacta requested that Plaintiff provide certain services to Medacta for the benefit of Medacta.

58. Medacta agreed to pay Plaintiff a reasonable amount in consideration of the services performed.

59. Plaintiff rendered the requested services but Medacta has refused to pay the reasonable value of the work performed.

60. As a direct and proximate result of Medacta's refusal to pay for services performed, Plaintiff has suffered damages in an amount to be determined at trial.

WHEREFORE, Plaintiff pray judgment against Defendant as set forth below.

//
//

## SIXTH CAUSE OF ACTION
## ACCOUNTING
**(Plaintiff against Defendant MEDACTA USA, INC. and Does 1-25)**

61. Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

62. Plaintiff is unable to ascertain the exact amount of funds owed to Plaintiff as commission payments and reimbursement for unlawful deductions. An unknown balance is due to Plaintiff that cannot be ascertained without an accounting, the means by which are within the knowledge of Medacta.

63. Accordingly, Plaintiff seeks an order by the Court directing an equitable accounting of all funds owed to Plaintiff.

WHEREFORE, Plaintiff prays judgment against Defendant as set forth below.

## SEVENTH CAUSE OF ACTION
## UNFAIR BUSINESS PRACTICE
**(Plaintiff against Defendant MEDACTA USA, INC. and Does 1-25)**

64. Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

65. Business and Professions Code § 17200 prohibits any unlawful, unfair or fraudulent business practices.

66. By acting as described above, Medacta engaged in unlawful, unfair and/or fraudulent business practices.

67. Specifically, Medacta acted in an unlawful, unfair and/or fraudulent manner by engaging in a practice and policy of:

   a. intentionally setting quotas that Medacta knew would be impossible or near impossible for distributors to achieve;

   b. setting impossible quotas to create perpetual grounds for "cause" for early termination of its Independent Sales Agent Agreements;

   c. increasing each year's quota by an arbitrary and unreasonable percentage to ensure distributors could not meet their quotas; and

d. assuring distributors that it will not enforce quotas to induce distributors to devote their time, effort and money to developing the territory for Medacta;

68. Medacta's unlawful, unfair and/or fraudulent conduct, and Plaintiff's injuries resulting therefrom, arose out of California.

69. As a result of Medacta's unfair business practices, Plaintiff is entitled to injunctive relief, restitution of monies and/or disgorgement of profits wrongfully obtained by Medacta.

WHEREFORE, Plaintiff prays judgment against Defendant as set forth below.

## EIGHTH CAUSE OF ACTION
### DECEPTIVE TRADE PRACTICES
**(Plaintiff against Defendant MEDACTA USA, INC. and Does 1-25)**

70. Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

71. Delaware Code § 2532 prohibits interference with the promotion and conduct of another's business.

72. By acting as described above, Medacta interfered with the promotion and conduct of Plaintiff's business by:

   a. intentionally setting quotas that Medacta knew would be impossible or near impossible for distributors to achieve;

   b. setting impossible quotas to create perpetual grounds for "cause" for early termination of its Independent Sales Agent Agreement;

   c. increasing each year's quota by an arbitrary and unreasonable percentage to ensure distributors could not meet their quotas; and

   d. assuring Plaintiff that it would not enforce quotas to induce Plaintiff to devote their time, effort and money to developing the territory for Medacta;

73. Further, by wrongfully appropriating Plaintiff's outside sales representatives and surgeons and directing them not to work with Plaintiff anymore, Medacta engaged in an ongoing pattern of deceptive conduct against Plaintiff. The harm is ongoing because Plaintiff

no longer has access to its base of customers and contractors and Medacta continues to benefit and profit from Plaintiff's work in bringing these individuals to Medacta.

74. As a result of Medacta's deceptive trade practices, Plaintiff is entitled to injunctive relief as well as monetary damages, including treble damages and attorneys' fees for Medacta's wanton and willful conduct.

WHEREFORE, Plaintiff prays judgment against Defendant as set forth below.

### NINTH CAUSE OF ACTION
### FRAUD
### (Plaintiff against Defendant MEDACTA USA, INC. and Does 1-25)

75. Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

76. By acting as described above, Medacta knowingly made false representations to Plaintiff that Medacta did not expect Plaintiff to achieve its Minimum Sales Volume numbers and would not terminate the Agreement on the basis of Plaintiff not achieving these numbers.

77. Medacta made these knowingly false representations with the intent to induce Plaintiff into entering into the Agreement.

78. Plaintiff reasonably relied on Medacta's misrepresentations and entered into the Agreement in reliance thereupon.

79. As a direct and foreseeable result of Medacta's fraud, Plaintiff has suffered and will continue to suffer damages in the form of damage to his long-standing reputation in the market, lost revenue, income, commissions, profit and other compensation, as well as interest, attorneys' fees, and costs.

80. Plaintiff is entitled to recover its reasonable attorneys' fees and costs pursuant to section 13.9. of the Agreement.

WHEREFORE, Plaintiff prays judgment against Defendant as set forth below.

//
//
//
//

16
FIRST AMENDED COMPLAINT; DEMAND FOR JURY TRIAL      Case No. Case No. 3:23-cv-00072
Case 3:23-cv-00072     Document 67     Filed 08/29/23     Page 16 of 19 PageID #: 358

## TENTH CAUSE OF ACTION
## PROMISSORY ESTOPPEL
### (Plaintiff against Defendant MEDACTA USA, INC. and Does 1-25)

81. Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

82. By making repeated verbal assurances that Medacta would not enforce the Minimum Sales Volume number, and that Medacta would treat these numbers as a soft goal under the Agreement, Medacta made a clear and unambiguous promise to Plaintiff that Medacta would not seek to terminate the Agreement on the basis of Plaintiff not achieving these numbers.

83. Plaintiff reasonably and justifiably relied upon the above promises made by Medacta in entering into the Agreement, Medacta failed to fulfill these promises, and Plaintiff suffered detriment as a result of Medacta's failure to fulfill its promises.

84. As a direct and foreseeable result of Medacta's failure to fulfill its promises, Plaintiff has suffered and will continue to suffer damages, including lost revenue, income, commissions, profit and other compensation, as well as interest, attorneys' fees, and costs.

WHEREFORE, Plaintiff prays judgment against Defendant as set forth below.

## ELEVENTH CAUSE OF ACTION
## DECLARATORY RELIEF
### (Plaintiff against Defendant MEDACTA USA, INC. and Does 1-25)

85. Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

86. A real, actual and ongoing dispute has arisen regarding the terms of the Agreement between Medacta and Plaintiff, including without limitation whether the Minimum Sales Volume is unenforceable due to waiver, estoppel, unconscionability, impossibility, impracticability, prevention of performance, fraud, mistake, modification and excuse, or any other defense to its enforcement; and whether Medacta lacked cause to terminate the Agreement.

87. A judicial declaration is necessary to resolve the dispute alleged above.

WHEREFORE, Plaintiff prays for a judicial declaration that the Minimum Sales Volume term is not enforceable against Plaintiff and that Medacta did not have cause to terminate the Agreement.

## **PRAYER**

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

1. An award of unpaid commissions in amounts to be proven at trial;

2. An award of special damages, including without limitations, lost commissions, opportunity costs, and other benefits, in amounts to be proven at trial;

3. For general damages, including mental and psychological suffering in the form of worry, humiliation, embarrassment, mental anguish and emotional distress, damage to reputation and all other non-economic damages;

4. For all other actual, consequential, and/or incidental damages;

5. For punitive and exemplary damages;

6. For treble damages pursuant to, among others, Cal. Civil Code § 1738.15 and Delaware Code § 2532;

7. For attorneys' fees and costs pursuant to, among others, Cal. Civil Code § 1738.16 and Delaware Code § 2532;

8. For restitution for, including, but not limited to, unpaid commissions;

9. For costs of suit herein incurred;

10. For injunctive relief;

11. For declaratory relief; and

12. For such other and further relief as the Court deems proper.

Dated: July 19, 2023            Respectfully Submitted,

By: *Natasha M. Galvez*
Scott A. Berman (CA State Bar No. 191460)
(*Admitted Pro Hac Vice*)
Natasha M. Galvez (CA State Bar No. 320784)
(*Admitted Pro Hac Vice*)

BERMAN NORTH LLP
2001 Van Ness Avenue, Suite 300
San Francisco, CA 94109
Phone: (415) 360-2885
Email: scott@bermannorth.com;
natasha@bermannorth.com

Clifford Wilson (TN State Bar No. 10683)
Tate, Wilson, Johnson, Meyer & Cherry, PLLC
100 Westwood Place, Suite 120
Brentwood, TN 37027
Phone: (615) 256-1125
Email: cwilson@tatewilsonlaw.com

*Attorneys for Plaintiff Stability Solutions, LLC*

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all of the issues in this case.

Dated: July 19, 2023                     Respectfully Submitted,

By: *Natasha M. Galvez*
Scott A. Berman (CA State Bar No. 191460)
(*Admitted Pro Hac Vice*)
Natasha M. Galvez (CA State Bar No. 320784)
(*Admitted Pro Hac Vice*)
Berman North LLP
2001 Van Ness Avenue, Suite 300
San Francisco, CA 94109
Phone: (415) 360-2885
Email: scott@bermannorth.com
natasha@bermannorth.com

Clifford Wilson (TN State Bar No. 10683)
Tate, Wilson, Johnson, Meyer & Cherry, PLLC
100 Westwood Place, Suite 120
Brentwood, TN 37027
Phone: (615) 256-1125
Email: cwilson@tatewilsonlaw.com

*Attorneys for Plaintiff Stability Solutions, LLC*