UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| STABILITY SOLUTIONS, LLC, | |
| Plaintiff, | Case No. 3:23-cv-00072 |
| v. | Magistrate Judge Alistair E. Newbern |
| MEDACTA USA, INC., | |
| Defendant. | |

## <u>MEMORANDUM OPINION</u>

This civil action arises out of a business agreement between Plaintiff Stability Solutions, LLC (Stability Solutions), and Defendant Medacta USA, Inc. (Medacta). (Doc. No. 67.) Before the Court are Medacta's second amended motion for summary judgment (Doc. No. 112) and two related motions filed by Stability Solutions—a motion for oral argument on Medacta's summary judgment motion (Doc. No. 137) and a motion to strike portions of Medacta's reply brief and exhibits (Doc. No. 138).

By the parties' consent and the Court's order, this action is referred to the undersigned Magistrate Judge to conduct all proceedings and order the entry of a final judgment in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. (Doc. No. 44.)

For the reasons that follow, Stability Solutions' motion for oral argument and motion to strike will be denied and Medacta's motion for summary judgment will be granted in part and denied in part.

## I.    Background

### A.    Factual Background

Ash Shaalan is the sole owner and employee of Stability Solutions, a Wyoming limited liability company that sells and distributes medical devices in California. (Doc. No. 128.) Medacta is a Delaware corporation based in Franklin, Tennessee, that markets and sells implantable orthopedic medical devices and related products. (Doc. Nos. 114, 114-1.)

Shaalan states that, around December 2020, he began conversations with Jim Shannon, then Medacta's Area Director for the Pacific Region, about working for Medacta as a distributor of hip and knee implants in Northern California. (Doc. No. 128.) Stability Solutions and Medacta entered into a written agreement effective April 1, 2021 (the Agreement), under which Stability Solutions would "provide sales, distribution, inventory management, customer support and related services" for Medacta in several counties in Northern California. (Doc. No. 114-1, PageID# 958; *see also* Doc. Nos. 127-2, 135.) The Agreement provided for an initial two-year term beginning on the effective date. (Doc. No. 114-1.) Shaalan states that, "[a]s part of the deal with Medacta, Medacta asked [him] to hire [Medacta employee] Larry Walsh [ ] as an independent sales representative working for Stability" and that he did so. (Doc. No. 128, PageID# 1610, ¶ 26.)

Section 1.2 of the Agreement addresses minimum sales volume (MSV) requirements and provides that:

> 1.2.    [Stability Solutions] shall be required to achieve a minimum dollar amount of Product sales ("Minimum Sales Volume") for each calendar year of the Term (or portion thereof) (each, a "Sales Period"). The Minimum Sales Volume for the first Sales Period is set forth on <u>Exhibit B</u> attached hereto. For each subsequent Sales Period, Medacta will in good faith determine the applicable Minimum Sales Volume and will provide such Minimum Sales Volume to [Stability Solutions] in writing approximately thirty (30) days following the end of each Sales Period. The Minimum Sales Volume will be based on factors reasonably determined by Medacta (e.g., [Stability Solutions'] sales in the prior Sales Period, the Territory's market potential, the availability of additional Products, the existence of like competitor products and any other factors considered by Medacta in its sole

discretion). Satisfaction of the Minimum Sales Volume shall be determined based upon a calculation of the "Net Invoice Price" (as defined below) of the Products sold by [Stability Solutions] during the applicable Sales Period.

> 1.2.1. Medacta may modify the Minimum Sales Volume in its sole discretion during a Sales Period in the event of previously unforeseen events or in accordance with Section 1.5.
>
> 1.2.2. Upon failure of [Stability Solutions] to meet the requirements specified in Section 9.2.5, Medacta may elect to modify or eliminate portions of the Territory at any time during the Term upon notice and an opportunity to cure consistent with Section 9.2.5. [Stability Solutions] must submit a written improvement plan, deemed acceptable to Medacta, detailing specific actions to cure defaults as provided in Section 9.2.5. If [Stability Solutions'] efforts to cure are not successful within the agreed upon time frame, Medacta may modify, change or eliminate portions of the Territory upon thirty (30) days written notice.

(Doc. No. 114-1, PageID# 958–59, ¶¶ 1.2–1.2.2.) Exhibit B to the Agreement states that "[t]he Minimum Sales Volume for the first year of the Initial Term (i.e., the period commencing April 1, 2021 and ending March 31, 2022) shall be $2,000,000 . . . ." (*Id.* at PageID# 975.) Shaalan states that, before he signed the Agreement, Medacta Compliance Officer Jaqueline Huber told him that the $2 million figure was not negotiable. (Doc. No. 128.) Shaalan further states that Shannon and Medacta Vice President of Sales Steve Kirschner "assured [him] that the quota was only a 'soft goal' and that [he] would not be required or even expected to achieve these numbers." (*Id.* at PageID# 1607, ¶ 14.) Shannon states that the first-year MSV "was always a goal" but "[i]t was never a hard[ ]line in the sand that [Stability Solutions] had to hit [ ] even though [the Agreement] says minimum sales volumes." (Doc. No. 129-11, PageID# 2115.) But Kirschner states that he "did not assure Shaalan that the Minimum Sales Volume outlined in the Agreement was a 'soft goal' or that Stability would not be expected or required to achieve those number to avoid contract termination." (Doc. No. 115, PageID#1003, ¶ 5.)

Section 9.2 of the Agreement addresses Medacta's right to early termination in certain circumstances. (Doc. No. 114-1.) It provides that:

> 9.2 Medacta may, upon notice to [Stability Solutions], terminate this Agreement prior to the expiration of the Term effective immediately upon the occurrence of any of the following:
>
> \* \* \*
>
> 9.2.5. Failure of [Stability Solutions] to meet (i) the applicable Minimum Sales Volume for any Sales Period or (ii) at least Seventy-Five percent (75%) of the applicable Minimum Sales Volume for any 2 consecutive Quarters of any Sales Period subject to the following opportunity to "cure" process: Medacta provides written notice advising [Stability Solutions] of the Minimum Sales Volume default. [Stability Solutions] must prepare a written improvement plan, detailing specific actions to cure said defaults. For the avoidance of doubt, the failure to present, in Medacta's sole judgment, an acceptable written improvement plan and/or failure to cure Minimum Sales Volume defaults after a notice period contained in an improvement plan approved by Medacta, shall constitute defaults considered no longer curable by [Stability Solutions], and Medacta may terminate effective immediately[.]

(*Id.* at PageID# 968–69, ¶¶ 9.2, 9.2.5.)

The Agreement states that it "is made and shall be governed by, and construed and enforced in accordance with, the internal laws of the State of Delaware, without regard to its conflicts of laws principles." (*Id.* at PageID# 972, ¶ 13.13.) It further states that the Agreement, including attached exhibits and schedules, "contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby, and contains all of the terms and conditions thereof and supersedes all prior agreements and understandings relating to the subject matter hereof." (*Id.* at PageID# 971, ¶ 13.3.) Section 13.3 provides that "[n]o changes or modifications of or additions to this Agreement shall be valid unless the same shall be in writing and signed by each party hereto." (*Id.*)

Stability Solutions did not meet the $2 million MSV requirement for the first year of the Agreement's Initial Term. (Doc. Nos. 127-2, 135.) According to Medacta records, Stability Solutions generated $464,449.00 in revenue from new surgeons between April 1, 2021, and March 31, 2022. (Doc. No. 135.) Shaalan states that no one at Medacta ever "informed [him] that [Stability Solutions] was in default or otherwise commented negatively about [Stability Solutions] missing the quarterly and annual goals." (Doc. No. 128, PageID# 1614, ¶ 44.) Instead, Shaalan states that he "continued to be congratulated for [his] wins along the way" and was also "paid a higher commission rate that was based on [Stability Solutions'] growth performance." (*Id.*) Shaalan states that, "[i]n or about January 2022, [he] hired Jim Karl as an independent sales representative . . . [and] had to take out [a] loan from Medacta" to do so, which Stability Solutions "paid back over time." (*Id.* at PageID# 1613, ¶ 37.)

Kirschner acknowledges that, during the first year of the Agreement, Stability Solutions "was able to grow [Medacta's] [N]orthern California territory much more effectively than the four distributors that immediately preceded [it,] . . . with some assistance from Medacta." (Doc. No. 129-10, PageID# 2058.) And Medacta Managing Director Matt Goudy concedes that none of Medacta's other distributors in California met their sales quotas in 2021. (Doc. Nos. 129-8, 135.)

In late 2021, David Waters replaced Shannon as Area Director. (Doc. Nos. 128, 129-9.) Waters emailed Kirschner on January 28, 2022, and recommended "extending" Shaalan "through the end of the year." (Doc. No. 129-9, PageID# 1989; Doc. No. 129-25, PageID# 2243; Doc. No. 135, PageID# 2348, ¶ 28.) On April 18, 2022, Waters emailed Kirschner proposing that Stability Solutions' MSV for the second year of the initial term be $3,075,000.00, which Kirschner approved. (Doc. Nos. 129-9, 129-25, 135.) Ten days later, Waters sent Shaalan a text message stating "FYI- The annual update for your 2nd year to Min Sales per year should be coming to you

this week. Should be coming from DocuSign." (Doc. No. 128-12, PageID# 1709.) Shaalan states

that this was the first time Waters addressed the MSV for the second year. (Doc. No. 128.) Shaalan

states that he signed the first amendment to the Agreement (the Amendment) on April 29, 2022.

(*Id.*)

> THIS FIRST AMENDMENT TO SALES AGENT AGREEMENT is made and entered into and effective as of April 1, 2022 by and between MEDACTA USA, INC. ("Medacta") and Stability Solutions, LLC, through its principal Ash Shalaan [sic] (collectively "Sales Agent") with respect to that certain Sales Agent Agreement dated April 1, 2021 entered into by and between Medacta and Sales Agent ("Agreement"). All capitalized terms used but not defined in this First Amendment shall have the same meaning as set forth in the Agreement.
>
> **FOR VALUABLE CONSIDERATION**, the adequacy and receipt of which is hereby acknowledged, the Agreement is hereby amended in the following particulars only:
>
> 1. Exhibit "B" of the Agreement is deleted and replaced with Exhibit "B-1" attached hereto and incorporated herein by reference.
>
> 2. Except as otherwise provided for herein, the terms of the Agreement shall remain in full force and effect.

(Doc. No. 114-2, PageID# 977.) Exhibit B-1 to the Amendment states that "[t]he Minimum Sales

Volume for the second year of the Initial Term (i.e. the period commencing April 1, 2022 and

ending March 31, 2023) shall be $3,075,000 . . . ." (*Id.* at PageID# 978.)

On June 27, 2022, Waters emailed Huber and another Medacta employee, copying

Kirschner, and asked them to "prepare termination documents for Ash (Stability Solutions)." (Doc.

No. 129-15, PageID# 2172.) Waters wrote:

> I believe he is short on performance metrics minimums YTD, but it has also come to my attention from multiple sources that he has been also representing a competitive line and has attempted to sell it (Signature) to one of our current customers (Dr. Mast). He is also not engaged in the business and has not participated in meetings like our National Sales meeting and not showed for cases when he told Jim Karl he would help him.

Rather than a cease demand and performance related termination process I would prefer I set a mutual termination to control the exit date and make it more timely and avoid messiness of the infidelity proof . . . .

(*Id.*) Huber drafted a mutual separation agreement and a notice of breach letter addressed to Shaalan and emailed them to Waters and Medacta General Manager Mark Waugh on June 29, 2022. (Doc. Nos. 129-5, 129-19.) The draft letter read, in part:

> . . . [P]lease consider this letter as notice of default of the Agreement for failure to [meet] at least 75% of the Minimum Sales Volume requirements for 2 consecutive quarters, as set forth in Section 9.2.5. More specifically, the Minimum Sales Volume and the actual sales achievement for recent quarters is set forth below.

| Quarter | Minimum Sales Volume Requirement | 75% of Minimum Sales Volume Requirement | Actual Sales Achievement |
|---------|----------------------------------|-----------------------------------------|--------------------------|
| Q4 2021 | $625,000 | $468,750 | $104,152 |
| Q1 2022 | $625,000 | $468,750 | $332,158 |
| Q2 2022 | $625,000 | $468,750 | $324,610 |

> Section 9.2.5 provides you with an "opportunity to cure" this default. Please provide us with your written improvement plan, including specific details and action items that you intend to take to cure the default no later than end of business day on July 7, 2022.

> Failure to provide the business plan by July 7 will constitute cause for immediate termination.

(Doc. No. 129-19, PageID# 2185–86.) Medacta did not send the draft notice of breach letter or draft mutual separation agreement to Shaalan. (Doc. Nos. 129-5, 135.)

Instead, on July 19, 2022, Medacta sent Shaalan a letter terminating the Agreement based on Stability Solutions' failure to meet the MSV for the first year of the Agreement's Initial Term. (Doc. No. 114-4.) The termination letter read, in part:

> . . . [P]lease consider this letter as notice of termination of the Agreement for failure to meet the applicable Minimum Sales Volume for any Sales Period, as set forth in Section 9.2.5. More specifically, the Minimum Sales Volume for the first year of the Initial Term (i.e., the period commencing April 1, 2021 and ending March 31, 2022), as set forth in Exhibit B of the Agreement, and the actual sales achievement for recent quarters is set forth below.

7

| Quarter | Minimum Sales Volume Requirement | Actual Sales Achievement . . . |
|---|---|---|
| Q2 2021 | $250,000 | $21,639 |
| Q3 2021 | $500,000 | $6,500 |
| Q4 2021 | $625,000 | $104,152 |
| Q1 2022 | $625,000 | $332,158 |
| **Total** | **$2,000,000** | **$464,449** |

Based upon the foregoing, please be advised that Medacta elects to terminate the Agreement pursuant to Section 9.2.5 effective July 22, 2022.

(*Id.* at PageID# 1001.)

There is no dispute that Medacta hired Walsh and Karl after terminating the Agreement with Stability Solutions. (Doc. No. 129-10.)

## B. Procedural History

Stability Solutions initiated this action by filing a complaint against Medacta in the Superior Court of California for San Francisco County alleging claims under California's Independent Wholesale Sales Representatives Act (IWSRA), Cal. Civ. Code §§ 1738.10–1738.17, and under California common law for breach of contract, breach of implied covenant of good faith and fair dealing, unjust enrichment, quantum meruit, an accounting, and unfair business practices. (Doc. No. 1-1.) Medacta removed the case to federal court in the Northern District of California (Doc. No. 1) and moved to dismiss Stability Solutions' complaint for improper venue under Federal Rule of Civil Procedure 12(b)(3) or, in the alternative, to transfer venue to this Court under 28 U.S.C. § 1404(a) (Doc. No. 5). The Northern District of California denied Medacta's request for dismissal and granted its request for transfer. (Doc. No. 21.) Upon transfer to the Middle District of Tennessee, Medacta answered Stability Solutions' complaint. (Doc. No. 28.)

On June 23, 2023, Medacta filed a motion for summary judgment (Doc. No. 51) and a motion to stay discovery (Doc. No. 50) pending resolution of its summary judgment motion. In response, Stability Solutions filed a motion (Doc. No. 57) for leave to file a proposed amended

complaint (Doc. No. 57-1) under Federal Rule of Civil Procedure 15(a)(2), which Medacta opposed (Doc. No. 64). The Court granted Stability Solutions' motion for leave to amend (Doc. No. 66) and later administratively terminated (Doc. No. 78) Medacta's summary judgment motion (Doc. No. 51).

The amended complaint, which remains the operative pleading, alleges that "Medacta set unachievable quotas for [Stability Solutions] while providing assurances that they would not be enforced" (Doc. No. 67, PageID# 344. ¶ 3); undermined Stability Solutions' sales efforts by "secretly meeting with" and hiring away Walsh and Karl (*id.* at PageID# 348, ¶ 25); failed to provide Stability Solutions with written notice of its minimum sales volume default and an opportunity to cure the default as required by the Agreement (*id.* at PageID# 349, ¶ 29); and failed to pay Stability Solutions all earned commissions in accordance with the Agreement (*id.* at PageID# 350, ¶ 32). Stability Solutions asserts state law statutory claims against Medacta under California's IWSRA (Count 1); California's unfair competition statute, Cal. Bus. & Prof. Code §§ 17200 *et seq.* (Count 7); and Delaware's Uniform Deceptive Trade Practices Act (UDTPA), Del. Code Ann. tit. 6, § 2532 (Count 8). (Doc. No. 67.) It asserts Delaware common law claims of breach of contract (Count 2); breach of the implied covenant of good faith and fair dealing (Count 3); unjust enrichment (Count 4); quantum meruit (Count 5); fraud (Count 9); and promissory estoppel (Count 10). (*Id.*) Stability Solutions also requests an accounting (Count 6), declaratory relief (Count 11), injunctive relief, and damages. (*Id.*)

Medacta answered Stability Solutions' amended complaint (Doc. No. 69) and filed a first amended motion for summary judgment (Doc. No. 74). Stability Solutions then filed a motion under Rule 56(d) asking the Court to order Medacta to participate in further discovery before requiring Stability Solutions to respond to Medacta's first amended motion for summary judgment.

9

(Doc. No. 79.) The Court granted Stability Solutions' Rule 56(d) motion over Medacta's opposition, administratively terminated Stability Solutions' first amended summary judgment motion, and ordered an additional period of discovery. (Doc. Nos. 92, 102.)

On June 14, 2024, Medacta filed a second amended motion for summary judgment on all of Stability Solution's claims against it (Doc. No. 112), supported by a memorandum of law (Doc. No. 113), a statement of undisputed material facts (Doc. No. 116), and several declarations and exhibits (Doc. Nos. 113-1–113-3, 114–114-4, 115, 115-1).[1] Stability Solutions responded in opposition, arguing that, at a minimum, there are genuine disputes of material fact regarding its claims of breach of contract (Count 2), breach of implied covenant of good faith and fair dealing (Count 3), violation of the IWSRA (Count 1) and California's unfair competition statute (Count 7), accounting (Count 6), and fraud (Count 9). (Doc. No. 127.) Stability Solutions supported its opposition to summary judgment on these claims with declarations and numerous exhibits. (Doc. Nos. 128–128-22, 129–129-29.) Stability Solutions did not respond to Medacta's summary judgment arguments regarding Stability Solutions' claims of unjust enrichment (Count 4), quantum meruit (Count 5), violation of Delaware's UDTPA (Count 8), promissory estoppel (Count 10), or declaratory relief (Count 11). Medacta filed a reply in support of its motion for summary judgment (Doc. No. 134) supported by a second declaration from its general counsel (Doc. No. 134-1) and exhibits (Doc. Nos. 134-2, 134-3).

Stability Solutions moved to strike the general counsel's second declaration and exhibits and certain arguments in Medacta's reply on the ground that they are new and therefore improperly

---

[1] One week later, Medacta also filed a motion to strike Jim Shannon as a witness (Doc. No. 117), which the Court addresses by separate order.

raised in a reply brief.[2] (Doc. No. 138.) Alternatively, Stability Solutions requests leave to conduct limited discovery and file a sur-reply brief. (*Id.*) Medacta responded in opposition to the motion to strike (Doc. No. 140), attaching ten additional exhibits (Doc. Nos. 140-1–140-10), and Stability Solutions filed a reply (Doc. No. 141) supported by a declaration from its counsel (Doc. No. 142) and six exhibits (Doc. No. 142-1–142-6).

Stability Solutions also filed a motion requesting that the Court hear oral argument on Medacta's second amended motion for summary judgment. (Doc. No. 137.) Medacta has not opposed Stability Solutions' motion for oral argument.

## II.        Legal Standard

In resolving a motion for summary judgment, the Court must undertake "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Under Federal Rule of Civil Procedure 56, a court must grant summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law[,]" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of demonstrating that no genuine issues of material fact exist. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party

---

[2]        Stability Solutions also filed "objections" to the same arguments and evidence. (Doc. No. 139.)

meets its burden, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (citation omitted); *see also Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 282 (6th Cir. 2012) ("Once a moving party has met its burden of production, 'its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'" (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986))). The parties "must support" their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or, alternatively, by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)–(B). Courts must view the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). However, if the moving party carries its initial burden, the non-moving party must show more than "[t]he mere existence of a scintilla of evidence in support of" his or her position. *Anderson*, 477 U.S. at 252. In order to proceed to trial, "there must be evidence on which the jury could reasonably find" for the non-moving party. *Id.*

III.     **Analysis**

A.     **Stability Solutions' Motion for Oral Argument**

Stability Solutions argues "that oral argument is necessary to better assist this Court in understanding the factual and legal issues related to [its] arguments in" opposition to summary judgment. (Doc. No. 137, PageID# 2360.) Having considered the summary judgment briefing and record evidence as a whole, the Court finds that further explanation is not required. Stability Solutions' motion for oral argument will therefore be denied.

12

## B.      Stability Solutions' Motion to Strike Parts of Medacta's Reply Brief

At the root of Stability Solutions' motion to strike Medacta's reply brief (Doc. No. 138) are two versions of an email between Medacta employees concerning sales commissions. (Doc. Nos. 128-20, 134-1). Medacta produced the first version of the email in discovery with redactions marked "confidential." (Doc. No. 128-20.) Stability Solutions relied on the redacted email in its response in opposition to Medacta's second amended motion for summary judgment, citing it as evidence that Medacta breached the Agreement's terms regarding commissions and committed fraud by concealing at least eight cases in which it owed unpaid commissions to Stability Solutions. (Doc. No. 127.)

Medacta filed an unredacted version of the email and a second declaration from Medacta General Counsel Tracy Hancock as an attachment to its reply brief in support of summary judgment. (Doc. No. 134-1.) Medacta cites these exhibits in support of its argument that Stability Solutions' "claim[ ] that 'through discovery' it learned of eight (8) 'hidden' purchase orders pointing to an e-mail chain from 2022 . . . is blatantly false and irrelevant." (Doc. No. 134, PageID# 2290.) Medacta argues that:

> This e-mail in no way supports Stability's claim of fraud. To remove any doubt, Medacta provides the unredacted e-mail to show six (6) of the alleged "hidden" commissions were for cases by Dr. Paul Hughes – not a Stability customer. *See* Second Declaration of Tracy Hancock ("Second Hancock Declaration") attached hereto as Exhibit D, ¶¶ 2–3; *see also* Plaintiff's Supplemental Response to Defendant Medacta's Interrogatories attached hereto as Exhibit E, No. 2. Stability's other nonpayment allegations are equally false. Stability says that it was not paid for Case 102926, but this is a case where Stability lost instruments. (Dkt. 128, ¶ 65). *See* Second Hancock Declaration, ¶¶ 4–6. The reason for this nonpayment was provided to Stability on each and every monthly commission statement since it went missing in 2021. *Id.* at ¶¶ 4–7. Nowhere does Stability suggest the instruments were found or that Medacta received payment. Stability also falsely swears that it was not paid for Cases 120197 and 125381. (Dkt. 128, ¶ 65). Stability's commission statement from May 2022 clearly shows payment for Cases 120197 and 125381. *See* Second Hancock Declaration, ¶¶ 7–9. Notably, Stability deposed six (6) Medacta employees. It did not question any of them regarding these alleged nonpayments and thus derived no helpful testimony. To be

admissible evidence of damages, Stability would have to show the commissions were earned, Medacta received payment for that case, and then did not pay Stability.

(*Id.* at PageID# 2290–91.)

Stability Solutions moves to strike the second Hancock declaration and exhibits "from consideration on the summary judgment motion" on the ground that they are "new" evidence offered in support of new arguments improperly raised in a reply brief. (Doc. No. 138, PageID# 2364.) Stability Solutions also asks the Court to strike the arguments in Medacta's reply brief that it characterizes as "new," including that (1) Stability Solutions was not entitled to commissions on sales for Dr. Hughes; (2) Medacta was not paid for two cases because Stability Solutions did not follow appropriate procedures; and (3) Stability Solutions' IWSRA claim fails on the merits. (Doc. No. 138.) In the alternative, Stability Solutions asks the Court to exclude the second Hancock declaration and exhibits under Federal Rule of Civil Procedure 37(c) or to allow Stability Solutions to file a sur-reply and conduct limited discovery. (*Id.*) Medacta opposed Stability Solutions' motion (Doc. No. 140), and Stability Solutions filed a reply (Doc. No. 141).

Federal Rule of Civil Procedure 12(f) provides that the Court may "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "Motions to strike are viewed with disfavor and are not frequently granted." *Operating Eng'rs Local 324 Health Care Plan v. G & W Constr. Co.*, 783 F.3d 1045, 1050 (6th Cir. 2015); *see also Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir. 1953) ("[T]he action of striking a pleading should be sparingly used by the courts . . . [and] is a drastic remedy to be resorted to only when required for the purposes of justice.").

Rule 12(f) provides a basis for striking pleadings, not briefs. *See* Fed. R. Civ. P. 12(f); *see also* Fed. R. Civ. P. 7(a) (defining "pleadings" to include a complaint, a third-party complaint, an answer to a complaint, counterclaim, crossclaim, or third-party complaint, or a reply to an answer).

14

Stability Solutions' "motion is not directed at a pleading; therefore, it does not comply with the requirements for a motion to strike and will be denied." *Kremer v. Reddit, Inc.*, Case No. 2:21-cv-00038, 2022 WL 2912184, at *2 (M.D. Tenn. July 22, 2022).

The Court will also deny Stability Solutions' request for leave to file a sur-reply. (Doc. No. 138.) "[T]he decision whether or not to grant filing a sur-reply is within the discretion of the Court." *Kivilaan v. Am. Airlines, Inc.*, Case No. 3:04-0814, 2008 WL 11390792, at *1 (M.D. Tenn. Oct. 17, 2008). "The standard for granting leave to file a sur[-]reply is whether the party making the motion would be unable to contest matters presented to the court for the first time in the opposing party's reply." *Cayton v. Metro. Gov't of Nashville & Davidson Cnty.*, Case No. 3:20-cv-00859, 2022 WL 183437, at *2 (M.D. Tenn. Jan. 19, 2022) (quoting *id.*). As explained herein, the evidence and arguments regarding the email and sales commissions are not relevant to the Court's determination of Medacta's second amended summary judgment motion. Stability Solutions' request for leave to address these arguments in a sur-reply is therefore moot. Stability Solutions' argument that Medacta should be precluded from relying on the unredacted email and other exhibits at summary judgment under Rule 37(c) is likewise moot at this juncture.

With respect to Medacta's brief argument about the merits of Stability Solutions' IWSRA claim, the Court finds that Stability Solutions put the merits of its IWSRA claim in contention in its opposition brief by arguing that:

> The statute's application does not turn on whether the sales representative is incorporated or lives in California. It applies when a sales representative is "engaged in business within this state [California]" and "solicits orders" in California. Stability's territory—the NorCal Territory—was in California and it solicited orders there . . . .

(Doc. No. 127, PageID# 1576 (first alteration in original) (citing Cal. Civ. Code §§ 1738.12(a)–(c) and (e), 1738.13).) Medacta responded to this argument in its reply brief, arguing that:

Stability [Solutions] [ ] wrongfully concludes the only factor for IWSRA's application is if a sales representative solicits orders in California. (Dkt. 127, pg. 26). Such broad application would make every internet sale subject to California law, and it ignores the "most significant relationship test." *Whitwell v. Archmere Acad., Inc.*, 463 F. Supp. 2d 482, 485 (D. Del. 2006) (The state that has the most significant relationship to the occurrence **and** the parties' agreement will govern the rights of the litigants). Medacta's Summary Judgment Motion provided this analysis, but Stability does not overcome it. (Dkt. 113, pg. 17). Finally, application of the IWSRA would only implicate missing contract terms or **willful** failure to pay commissions. Cal. Civ. Code § 1738.13, 15. Stability claims Medacta failed to pay earned commissions and terminated the Agreement without an opportunity to cure. (Dkt. 67, ¶ 38). The IWSRA would not matter as these same allegations fail to establish a breach of contract and Stability does not identify any missing contract terms. Stability's causes of action based on California law fail. Summary judgment should be granted on this claim.

(Doc. No. 134, PageID# 2289–90.) Because Stability Solutions raised the issue of the IWSRA's application in its opposition brief, it cannot now argue that Medacta "'presented'" this matter "'for the first time in . . . [its] reply'" or that Stability Solutions lacked an opportunity to "'contest'" it. *Cayton*, 2022 WL 183437, at *2 (quoting *Kivilaan*, 2008 WL 11390792, at *1).

### C.    Medacta's Motion for Summary Judgment

#### 1.    Unjust Enrichment (Count 4), Quantum Meruit (Count 5), Delaware's UDTPA (Count 8), Promissory Estoppel (Count 10), and Declaratory Relief (Count 11)

Stability Solutions has not opposed Medacta's second amended motion for summary judgment on its claims of unjust enrichment (Count 4), quantum meruit (Count 5), violation of Delaware's UDTPA (Count 8), promissory estoppel (Count 10), and for declaratory relief (Count 11). (Doc. No. 127.) Stability Solutions states that it "does not address Medacta's arguments" on these claims in order "[t]o streamline the case[.]" (*Id.* at PageID# 1563, n.4.) The Court construes this statement as an acknowledgement that Stability Solutions has abandoned the claims. Summary judgment will therefore be entered in Medacta's favor on Counts 4, 5, 8, 10, and 11 of Stability Solutions' amended complaint (Doc. No. 67).

16

## 2.    Breach of Contract (Count 2)

Stability Solutions' breach of contract claims are the primary focus of its amended complaint. Stability Solutions alleges that Medacta breached the Agreement by:

- failing to establish in good faith the applicable Minimum Sales Volume for the first year of the Agreement, or any quarter therein, as required by section 1.2;

- failing to establish in good faith the applicable Minimum Sales Volume for the second year of the Agreement or any quarter therein, as required by section 1.2;

- withdrawing and failing to provide sales and marketing support;

- purporting to enforce provisions relating to the Minimum Sales Volume that were unenforceable due to waiver, estoppel, unconscionability, impossibility, impracticability, prevention of performance, fraud, mistake, modification and excuse, among other things;

- failing to provide advance notice of Stability Solutions' purported default, as required by Sections 1.2.2 and 9.2.5. of the Agreement;

- failing to allow Stability Solutions to prepare a written improvement plan, as required by Sections 1.2.2 and 9.2.5. of the Agreement;

- failing to allow Stability Solutions the opportunity to cure the default within the "notice period contained in an improvement plan approved by Medacta;"

- failing to give an additional "thirty (30) days written notice" upon any failure by Stability Solutions to cure within the notice period;

- terminating the Agreement without cause; and

- failing to pay Stability Solutions all commissions owed under the Agreement.

(Doc. No. 67, PageID# 352–53, ¶ 45.)

To prevail on a breach of contract claim under Delaware law, a plaintiff must establish: "(1) the existence of a contract, whether express or implied; (2) breach of one or more of the

contract's obligations; and (3) damages resulting from the breach."[3] *Geico Gen. Ins. Co. v. Green*, 308 A.3d 132, 140 (Del. 2022). The first and third elements are not in dispute. Medacta and Stability Solutions agree that the Agreement is a valid and enforceable contract, and Medacta has not argued that there are no questions of fact as to whether Stability Solutions can prove damages. Instead, the parties' arguments focus on the second element—whether Stability Solutions can show, based on the record evidence, that Medacta breached the Agreement.

Medacta argues that it is entitled to summary judgment on Stability Solutions' breach of contract claims because: (1) Medacta complied with the plain language of the Agreement allowing it to terminate the contract based on Stability Solutions' failure to meet the minimum sales volume for the first year of the Agreement's Initial Term; (2) the parol evidence rule bars the Court from considering any evidence of an oral or implied contract outside the Agreement related to the minimum sales volume; and (3) the opportunity-to-cure provision of the Agreement was inapplicable or immaterial to Stability Solutions' breach. (Doc. No. 113.)

With respect to Medacta's first argument, Stability Solutions responds that Medacta violated the Agreement by purporting to enforce the first year minimum sales volume requirement contained in Exhibit B to the Agreement after the parties deleted Exhibit B and replaced it with Exhibit B-1, which contained the second year minimum sales volume requirement. (Doc. No. 127.) Medacta replies that, because Exhibit B-1 did not go into effect until after the sales period addressed by Exhibit B expired, "Stability's argument that the first year MSV never existed cartwheels over logic." (Doc. No. 134, PageID# 2292.)

---

[3]    For purposes of summary judgment, there is no dispute that Delaware law governs these claims.

"The party seeking summary judgment bears the initial burden of presenting law and argument in support of its motion as well as identifying the relevant portions of '"the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.'" *Denoewer v. Union Cnty. Indus.*, 611 F. Supp. 3d 458, 468 (S.D. Ohio 2020) (quoting *Celotex Corp.*, 477 U.S. at 323). Medacta has not met that burden with regard to Stability Solutions' breach of contract claims.

First, Medacta misconstrues Stability Solutions' argument regarding the Amendment's effect on the Agreement. Stability Solutions argues that Medacta breached their contract by attempting to enforce Exhibit B's first year minimum sales volume requirement on July 19, 2022, more than three months after the parties removed that term from the Agreement. (Doc. No. 127.) Medacta does not dispute that, effective April 1, 2022, the Amendment "deleted" "Exhibit 'B' of the Agreement" and "replaced" it with "Exhibit 'B-1.'" (Doc. No. 114-2, PageID# 977, ¶ 1.) But Medacta has not addressed the effect of that deletion or the Amendment's term that, "[e]xcept as otherwise provided for herein, the terms of the Agreement shall remain in full force and effect." (*Id.* at ¶ 2.) While Medacta implies that it is beyond dispute that Exhibit B would remain in effect after its "delet[ion]" and "replace[ment]" to govern actions taken during the Agreement's first year, it offers no argument or authority to support that position as a matter of law. Medacta also has not addressed Stability Solutions' claim that Medacta breached the Agreement by failing to determine the minimum sales volume requirements in good faith.

The Amendment's effect on the Agreement is central to Stability Solutions' breach of contract claims. Because Medacta has not met its summary judgment burden regarding that threshold issue, the Court need not address its other arguments for summary judgment on this cause of action.

### 3. Breach of Implied Covenant of Good Faith and Fair Dealing (Count 3)

"The implied covenant of good faith and fair dealing is the doctrine by which Delaware law cautiously supplies terms to fill gaps in the express provisions of a specific agreement."[4] *Allen v. El Paso Pipeline GP Co.*, 113 A.3d 167, 182 (Del. Ch. 2014); *see also Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005) ("The covenant is 'best understood as a way of implying terms in the agreement,' whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions." (footnotes omitted) (quoting *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 443 (Del. 1996))); *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010) ("The implied covenant of good faith and fair dealing involves a 'cautious enterprise,' inferring contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated." (citation omitted)). "The elements of a claim for breach of an implied covenant of good faith and fair dealing are 'a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff.'" *Dow Chem. Can. Inc. v. HRD Corp.*, 656 F. Supp. 2d 427, 445 (D. Del. 2009) (quoting *Cantor Fitzgerald, L.P. v. Cantor*, No. C.A. 16297, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998)). "When presented with an implied covenant claim, a court first must engage in the process of contract construction to determine whether there is a gap that needs to be filled." *Allen*, 113 A.3d at 183. In other words, "the court decides whether the language of the contract expressly covers a particular issue, in which case the implied covenant will not apply, or whether the contract is silent on the subject, revealing a gap that the implied covenant might fill." *Id.* "[B]ecause the implied covenant is, by definition, implied, and because it protects the spirit of the agreement rather than the form, it cannot be

---

[4] There is no dispute that Delaware law also governs Stability Solutions' claims for breach of the implied covenant of good faith and fair dealing.

invoked where the contract itself expressly covers the subject at issue." *Id.* (alteration in original) (quoting *Fisk Ventures, LLC v. Segal*, Civ. Action No. 3017, 2008 WL 1961156, at *10 (Del. Ch. May 7, 2008)); *see also Allied Cap. Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1032 (Del Ch. 2006) ("[I]mplied covenant analysis will only be applied when the contract is truly silent with respect to the matter at hand[.]"). "Thus, one generally cannot base a claim for breach of the implied covenant on conduct authorized by the terms of the agreement." *Dunlap*, 878 A.2d at 441.

Stability Solutions alleges that "the covenant that each party will act in good faith[,] [ ] deal fairly with each other . . . [,]" and "do nothing to deprive any party of the contractual benefits due under the contract" is "[i]mplied in every contract" and that Medacta breached this implied covenant by:

- falsely promising not to enforce the Minimum Sales Volume numbers without intending to honor that promise;

- falsely promising to provide sales and marketing support without intending to honor that promise;

- withdrawing and failing to provide sales and marketing support;

- falsely promising to retain Stability Solutions as a distributor for at least two years without intending to honor that promise;

- inducing Stability Solutions to spend time, money and resources hiring sales representatives and developing customers while intending to terminate the Agreement and contract directly with Stability Solutions' customers and sales representatives;

- failing to establish in good faith the applicable Minimum Sales Volume for the first year or second year of the Agreement, or any quarter therein;

- purporting to enforce provisions relating to the Minimum Sales Volume which were unenforceable due to waiver, estoppel, unconscionability, impossibility, impracticability, prevention of performance, fraud, mistake, modification and excuse, among other things;

- interfering with, undermining and sabotaging Stability Solutions' relationships with its outside sales representatives and customers;

- failing to provide in good faith notice and opportunity to cure to Stability Solutions;

- terminating the Agreement based on Minimum Sales Volume numbers after assuring Stability Solutions that it would not enforce those numbers against Stability Solutions; and

- terminating the Agreement to contract directly with the surgeon/customers and sales representatives recruited by Stability Solutions and thereby, avoid having to pay Stability Solutions for its efforts.

(Doc. No. 67, PageID# 353–54, ¶ 50.) Stability Solutions claims that these breaches caused "damages to [Shaalan's] long-standing reputation in the market, lost revenue, income, commissions, profit, and other compensation, as well as interest, attorneys' fees, and costs." (*Id.* at PageID# 354, ¶ 51.)

Medacta's sole argument in support of summary judgment on this claim is that "Stability's allegations for the breach of the implied covenant of good faith and fair dealing merely echo its claim for breach of contract." (Doc. No. 113, PageID# 913.) Medacta relies on *Khushaim v. Tullow Inc.*, C.A. No. N15C-11-212, 2016 WL 3594752 (Del. Super. Ct. June 27, 2016), for the propositions that "'[a] breach of the implied covenant claim cannot be based on conduct that the contract expressly addresses'" and that "'"[m]erely repeating the defendant's allegedly improper acts or omissions already the subject of a separate breach of contract claim is insufficient to support a claim for breach of the implied covenant of good faith and fair dealing."'" (*Id.* at PageID# 912 (quoting *Khushaim*, 2016 WL 3594752, at *4).)

Medacta is correct that the covenant of good faith and fair dealing "'cannot be invoked where the contract itself expressly covers the subject at issue.'" *Allen*, 113 A.3d at 183 (quoting *Fisk Ventures, LLC*, 2008 WL 1961156, at *10). There is no genuine dispute of material fact that the Agreement expressly addresses at least some of the issues underlying Stability Solutions' breach of implied covenant claims, including, for example, establishing minimum sales volume

requirements in good faith, providing notice and opportunities to cure, compensation, and termination. (Doc. No. 114-1.)

Stability Solutions argues generally that its breach of implied covenant claims are factually distinct from its breach of contract claims and cites three examples. (Doc. No. 127.) Stability Solutions cites evidence that (1) Waters secretly "recruited Stability's sales representatives and surgeons to work directly with Medacta" during the contract term to "cut[ ] out Stability" and "cut [Medacta's] commission costs almost in half . . ."; (2) "Waters spread false rumors about Stability to justify its termination despite its excellent performance"; and (3) "Medacta concealed numerous cases in the NorCal Territory to avoid paying Stability on those cases." (*Id.* at PageID# 1573, 1574.) Stability Solutions has not addressed Medacta's argument that it cannot base its breach of implied covenant claims on issues expressly covered by the Agreement.

Because there is no genuine dispute of material fact that the Agreement directly addresses Medacta's ability to set minimum sales volume requirements and obligation to pay Stability Solutions commissions—indeed, Stability Solutions' breach of contract claims are based in part on Medacta's alleged failure to comply with these terms of the Agreement—and because Stability Solutions has not directly responded to this argument, Medacta's motion for summary judgment will be granted with respect to Stability Solutions' claim that Medacta violated the implied covenant of good faith and fair dealing by setting unachievable minimum sales volume requirements and failing to pay all commissions owed under the Agreement.

This leaves Stability Solutions' breach of implied covenant claims based on Waters's alleged conduct. Medacta argues in its reply brief that Stability Solutions' "new allegations of 'false rumors' or 'interference' cannot rescue [its] [implied covenant] claim because Stability [Solutions] does not suggest that any such conduct prevented it from achieving the MSV." (Doc.

No. 134, PageID# 2289.) But the Delaware Supreme Court has held that "the implied covenant requires 'a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits' of the bargain" and that "parties are liable for breaching the covenant when their conduct frustrates the 'overarching purpose' of the contract by taking advantage of their position to control implementation of the agreement's terms." *Dunlap*, 878 A.2d at 442 (first quoting *Wilgus v. Salt Pond Inv. Co.*, 493 A.2d 151, 159 (Del. Ch. 1985), *superseded by statute*; and then quoting *Breakaway Sols., Inc. v. Morgan Stanley & Co.*, No. Civ.A. 19522, 2004 WL 1949300, at *12 (Del. Ch. Aug. 27, 2004)). Medacta does not address this line of authority or provide any other support for its cursory argument regarding these remaining claims. Accordingly, summary judgment will be denied with respect to Stability Solutions' implied covenant claims based on evidence that Waters pursued Stability Solutions' sales representatives and surgeons and spread false information about Shaalan. *Cf. McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("'It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.'" (alteration in original) (quoting *Citizens Awareness Network, Inc. v. U.S. Nuclear Regul. Comm'n*, 59 F.3d 284, 293–94 (1st Cir. 1995))).

### 4.    California Statutory Claims (Counts 1 and 7)

Medacta argues generally that Stability Solutions' California IWSRA and unfair competition statutory claims fail because the parties chose to apply Delaware law to the Agreement and Delaware law does not recognize causes of action based on California statutes. (Doc. No. 113.) Stability Solutions responds that the choice-of-law clause in the Agreement applies only to claims arising under the Agreement's terms and does not preclude Stability Solutions from seeking non-contractual relief under California law. (Doc. No. 127.) Determination of Medacta's summary judgment argument on these claims thus requires defining the scope of the Agreement's choice-

of-law provision that "[t]his Agreement is made and shall be governed by, and construed and enforced in accordance with, the internal laws of the State of Delaware, without regard to its conflicts of law principles." (Doc. No. 114-1, PageID# 972, ¶ 13.13.)

It is well established that where, as here, a choice of law question arises in a diversity action, courts apply the forum state's choice of law rules. *CenTra, Inc. v. Estrin*, 538 F.3d 402, 409 (6th Cir. 2008). Tennessee is the forum state in this action, but neither Medacta nor Stability Solutions has applied relevant Tennessee authority. Instead, Medacta relies on the Restatement (Second) of Conflicts of Laws to argue that, "[t]o rule on a choice of law analysis, the Court uses a most significant relationship test <u>only if</u> the parties did not include a choice of law provision in their contract."[5] (Doc. No. 113, PageID# 918 (citing Restatement (Second) of Conflict of L. § 186 (Am. L. Inst. 1971)).) Tennessee law provides a different framework. "The first step of any choice-of-law analysis under Tennessee law 'is to decide whether a conflict actually exists between the relevant laws of the different jurisdictions.'" *Miller v. Brightstar Int'l Corp.*, Case No. 3:20-cv-00313, 2022 WL 17070541, at *4 (M.D. Tenn. Nov. 17, 2022) (quoting *Boswell v. RFD-TV the Theater, LLC*, 498 S.W.3d 550, 555 (Tenn. Ct. App. 2016))), *report and recommendation adopted*, 2022 WL 17420371 (M.D. Tenn. Dec. 5, 2022). If so, "Tennessee will honor a choice of law clause if the state whose law is chosen bears a reasonable relation to the transaction and absent a violation of the forum state's public policy." *Boswell*, 498 S.W.3d at 556 (quoting *Bourland, Heflin, Alvarez, Minor & Matthews, PLC v. Heaton*, 393 S.W.3d 671, 674 (Tenn. Ct. App. 2012)).

---

[5]     Medacta also cites *Jung v. El Tinieblo International, Inc.*, C.A. No. 2021-0798, 2022 WL 16557663, at *7–8 (Del. Ch. Oct. 31, 2022), in support of its general argument that Delaware law does not recognize California causes of action. (Doc. No. 113.) But *Jung* is inapposite because the contract at issue did not contain a choice of law provision. 2022 WL 16557663, at *15.

25

To the extent Medacta relies on Tennessee authority, it does so incompletely. Medacta cites *Goodwin Bros. Leasing, Inc. v. H & B Inc.*, 597 S.W.2d 303, 306 (Tenn. 1980), for the general proposition that, "[i]f the parties manifest an intent to instead apply the laws of another jurisdiction, then that intent will be honored . . . ." (Doc. No. 113, PageID# 918 (second alteration in original).) But this language does not appear in *Goodwin Bros. Leasing, Inc.* Rather, it is a quotation from *Vantage Technology, LLC v. Cross*, 17 S.W.3d 637, 650 (Tenn. Ct. App. 1999), and Medacta omits important qualifying language:

> Tennessee follows the rule of *lex loci contractus*. This rule provides that a contract is presumed to be governed by the law of the jurisdiction in which it was executed absent a contrary intent.
>
> If the parties manifest an intent to instead apply the laws of another jurisdiction, then that intent will be honored *provided certain requirements are met*. The choice of law provision must be executed in good faith. The jurisdiction whose law is chosen must bear a material connection to the transaction. The basis for the choice of another jurisdiction's law must be reasonable and not merely a sham and subterfuge. Finally, the parties' choice of another jurisdiction's law must not be "contrary to 'a fundamental policy' of a state having [a] 'materially greater interest' and whose law would otherwise govern."

*Vantage Tech., LLC*, 17 S.W.3d at 650 (emphasis added) (alteration in original) (first citing *Ohio Cas. Ins. Co. v. Travelers Indem. Co.*, 493 S.W.2d 465, 467 (Tenn. 1973); then citing *Goodwin Bros. Leasing, Inc.*, 597 S.W.2d at 306; and then quoting *id.* at n.2). Medacta has not addressed the additional factors a court must consider under *Vantage Technology*, nor has it addressed how any other relevant Tennessee authority applies in this case. It therefore has not shown as a matter of law that the Agreement's choice-of-law clause bars Stability Solutions from asserting claims under the IWSRA and California's unfair competition statute. Because this is the only argument Medacta makes in support of summary judgment on Stability Solutions' California statutory claims, it has not carried its summary judgment burden.

### 5. Fraud (Count 9)

To prevail on a fraud claim under Delaware law, the plaintiff must establish that:

(1) the defendant falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendant knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance.

*DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 958 (Del. 2005).

Stability Solutions' amended complaint alleges that Medacta is liable for fraud based on false representations it made regarding minimum sales volume requirements. (Doc. No. 67.) Specifically, Stability Solutions alleges that "Medacta knowingly made false representations to [Stability Solutions] that Medacta did not expect [Stability Solutions] to achieve its Minimum Sales Volume numbers and would not terminate the Agreement on the basis of [Stability Solutions] not achieving these numbers"; "Medacta made these knowingly false representations with the intent to induce [Stability Solutions] into entering into the Agreement"; "[Stability Solutions] reasonably relied on Medacta's misrepresentations and entered into the Agreement in reliance thereupon"; and "[a]s a direct and foreseeable result of Medacta's fraud, [Stability Solutions] has suffered and will continue to suffer damages in the form of damage to [Shaalan's] long-standing reputation in the market, lost revenue, income, commissions, profit and other compensation, as well as interest, attorneys' fees, and costs." (*Id.* at PageID# 358, ¶¶ 76–79.)

Medacta argues that it is entitled to summary judgment on Stability Solutions' fraud claim because Delaware law does not allow plaintiffs to ""bootstrap" a claim of breach of contract into a claim of fraud" under the circumstances presented here (Doc. No. 113, PageID# 914 (quoting *EZLinks Golf, LLC v. PCMS Datafit, Inc.*, C.A. No. N16C-07-080, 2017 WL 1312209, at *5 (Del. Super. Ct. Mar. 13, 2017))); there is "no evidence the alleged promises were false when allegedly

made" (*id.* at PageID# 915); and "Stability cannot simultaneously allege it was tricked into a contract while seeking to enforce the same contract with its unilateral modifications" (*id.* at PageID# 916).

Stability Solutions does not respond to any of these arguments. Instead, Stability Solutions argues for the first time that Medacta is liable for "fraudulent concealment" because "Medacta knew Stability had not been paid on [at least eight] cases, knew Stability had no way of knowing about them, and concealed their existence to avoid having to pay." (Doc. No. 127, PageID# 1574.) Medacta replies that Stability Solutions has changed the basis of its fraud claim from "'false representations' of the MSV being a 'soft goal' . . . to unpaid commissions" and argues that "[i]t is too late for Stability [Solutions] to reimagine its fraud claim." (Doc. No. 134, PageID# 2290 (first quoting Doc. No. 67, PageID# 358, ¶¶ 76, 77; and then quoting *id.* at PageID# 347, ¶ 20).)

Medacta is correct "that a plaintiff may not expand its claims to assert new theories in response to summary judgment . . . ." *Vonderhaar v. Waymire*, 797 F. App'x 981, 990 (6th Cir. 2020) (alteration in original) (quoting *Renner v. Ford Motor Co.*, 516 F. App'x 498, 504 (6th Cir. 2013)); *see also Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007) ("To the extent Bridgeport seeks to expand its claims to assert new theories, it may not do so in response to summary judgment . . . ."). "Rather, if a plaintiff wishes to expand their claim mid-stream—because, for instance, they unearthed new evidence of misconduct in discovery—"the proper procedure . . . is to amend the complaint in accordance with Rule 15(a)." *Vonderhaar*, 797 F. App'x at 990 (alteration in original) (quoting *Tucker v. Union of Needletrades, Industrial & Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005)); *see also Renner*, 516 F. App'x at 504 (quoting *Tucker*, 407 F.3d at 788). Stability Solutions "neither amended [its] complaint nor sought leave to do so, and [it] cannot now claim" Medacta's alleged concealment of cases as a basis for

its fraud claim. *Renner*, 516 F. App'x at 504. And, because Stability Solutions has not addressed Medacta's arguments regarding the fraud claim as alleged in the amended complaint, it has effectively abandoned that cause of action.

Accordingly, Medacta's summary judgment motion will be granted with respect to Stability Solutions' fraud claim.

### 6. Accounting (Count 6)

The amended complaint alleges that Stability Solutions "is unable to ascertain the exact amount of funds owed to [it] as commission payments and reimbursement for unlawful deductions" and "seeks an order by the Court directing an equitable accounting of all funds owed to [it]" by Medacta. (Doc. No. 67, PageID# 356, ¶¶ 62, 63.) Medacta argues that it is entitled to summary judgment on Stability Solutions' accounting claim based on sworn statements from Medacta's general counsel that Medacta has paid Stability Solutions in full for all commissions it earned. (Doc. Nos. 113, 114.) Stability Solutions responds that "[a]n accounting is necessary" in relation to its fraud claim "to identify the remaining amounts" of owed commissions that Medacta allegedly concealed. (Doc. No. 127, PageID# 1574.) Medacta replies that Stability Solutions' accounting claim fails as a matter of law because Stability Solutions has not shown the "absence of an adequate legal remedy; equitable grounds for relief; and that the accounts in question are so complex the Court could not determine the amounts due without a formal accounting." (Doc. No. 134, PageID#2288.)

"Under well-accepted Delaware law, '[a]n accounting is an equitable remedy that consists of the adjustment of accounts between parties and a rendering of a judgment for the amount ascertained to be due to either as a result.'" *Garza v. Citigroup Inc.*, 192 F. Supp. 3d 508, 511 (D. Del. 2016) (alteration in original) (quoting *Albert v. Alex. Brown Mgmt. Servs., Inc.*, No. Civ.A. 762-N, 2005 WL 2130607, at *11 (Del. Ch. Aug. 26, 2005)). Courts applying Delaware

law recognize that "an accounting 'reflects a request for a particular type of remedy, rather than an equitable claim in and of itself.'" *Id.* (quoting *Stevanov v. O'Connor*, Civ. Action No. 3820, 2009 WL 1059640, at *15 (Del. Ch. Apr. 21, 2009)). Consequently, "an accounting is 'dependent on the viability and outcome of the underlying causes of action[.]'" *Id.* (quoting *Addy v. Piedmonte*, Civ. Action No. 3571, 2009 WL 707641, at *23).

The Court has already determined that Medacta is entitled to summary judgment on Stability Solutions' fraud claim. Because the claim underlying Stability Solutions request for an accounting is not viable, the accounting claim also fails. Further, Stability Solutions has not shown "the absence of an adequate remedy at law" which, as Medacta argues, is a "necessary prerequisite to the right to maintain a suit for an equitable accounting[.]" *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962).

Summary judgment will be granted on Stability Solutions' accounting claim.

IV.     **Conclusion**

For these reasons, Stability Solutions' motion for oral argument (Doc. No. 137) will be denied, Stability Solutions' motion to strike Medacta's reply brief (Doc. No. 138) will be denied, and Medacta's second amended motion for summary judgment (Doc. No. 112) will be granted in part and denied in part as set out in this Memorandum Opinion. An appropriate order will issue.

It is so ORDERED.

_____
ALISTAIR E. NEWBERN
United States Magistrate Judge